IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SAFAA AL-ZERJAWI, | ) | |
| | ) | CASE NO. 4:15CV2512 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| JAMES KLINE, *D.O.*, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

On February 3, 2014, Plaintiff Saffa Al-Zerjawi, at the time an inmate at the Ohio

Corrections Reception Center ("CRC"), was hit in the face with a rock by his cellmate, fracturing

the zygomatic arch on the left side of his face.  He received some treatment at CRC and was

transferred to Trumbull Correctional Institution ("TCI") on April 10, 2014, where he received

further treatment.  Al-Zerjawi alleges that Defendants, who are two doctors by whom he was

seen at CRC and TCI and two additional doctors who, he alleges, had authority to authorize

treatment outside these facilities, violated his Eighth Amendment right to be free from cruel and

unusual punishment when they did not timely address the fractured bones in his face and did not

authorize plastic surgery until after the optimal time for surgery had passed.[1]

Defendants have filed a Motion for Summary Judgment ("Motion") (Doc. 82), which has

been fully briefed.  For the reasons set forth below, the undersigned recommends that

Defendant's Motion be **GRANTED** in part and **DENIED** in part.  Specifically, the undersigned

recommends that the Motion be **GRANTED** as to all claims by Al-Zerjawi other than his claim

that Defendant Drs. Cullen, Saul and Eddy were deliberately indifferent because they delayed

---

[1]  Plaintiff also named one other doctor and four nurses in his Amended Complaint, but these defendants have not
been served.  Previously, in an Interim Report and Recommendation (Doc. 92), the undersigned recommended that
Plaintiff's claims against these unserved defendants be dismissed without prejudice.

treatment of his facial fracture between February 5 or 6, 2014, and March 25, 2014, a delay that was detrimental to him because it made corrective surgery more difficult and less likely to be successful.  With respect to that claim, the motion should be **DENIED**.[2]  The undersigned further recommends that the Court hold that Drs. Cullen, Saul and Eddy are not entitled to qualified immunity on that claim.

## I. Background facts as alleged by Plaintiff

The following, brief summary is provided as background.[3]  On February 3, 2014, at approximately 1:00 a.m., Plaintiff, an inmate at the CRC, was attacked by his cellmate.  His cellmate hit him in the face with a rock.  Plaintiff was taken to the prison medical department and was treated by staff nurse Phillian.  Plaintiff complained that bones in his face were broken. Phillian assessed him with scratches and bites on his face and hands, treated his wounds, and sent him to segregation.  On the way to segregation, Plaintiff vomited.  Once in his cell, Plaintiff pressed the emergency alarm button and complained to the answering officer that his face hurt and "showed him my fractures."  The officer called a nurse, who had been present at Nurse Phillian's exam.  The second nurse told Plaintiff to lie down and go to sleep.  Plaintiff alleges that he had suffered a concussion.

Later that morning, Plaintiff told the pill call nurse that he needed to see a doctor.  She told him no because it was not an emergency.  Plaintiff later told the second shift nurse that he needed to see a doctor and complained that he could not eat due to pain and jaw dysfunction. The second shift nurse gave him Ensure to drink and put him on the doctor's schedule to be seen on February 4.  Plaintiff did not see the doctor, Defendant Dr. Cullen, until February 5.  Dr.

---

[2] The undersigned also rejects Al-Zerjawi's attempt to inject into this case by way of briefing a failure to protect claim that is not alleged in his Amended Complaint.

[3] These facts are primarily taken from the Statement of Claim contained in Plaintiff's Verified Amended Complaint, Doc. 55, pp. 5-8.  The undersigned discusses the factual allegations (and Defendants' version of events) in more detail when discussing Plaintiff's claims, *infra*.

Cullen felt Plaintiff's face and assessed him with broken bones.  Plaintiff asked to go to the hospital but Dr. Cullen explained that x-rays would need to be taken first.  X-rays were taken on February 10.  The radiologist assessed a "probable" facial fracture and recommended further x-rays.  Doc. 82-9, p. 17.  A second set of x-rays was taken on February 26, confirming a comminuted fracture of Plaintiff's zygomatic arch.  Doc. 94-8, p. 2.

Thereafter, Plaintiff was scheduled for a CT scan, which occurred on March 21, and a videoconference, also known as a Telemed, with a plastic surgeon, which occurred on March 25, 50 days after Plaintiff was attacked.  The plastic surgeon advised that there would be complications addressing Plaintiff's injuries so long after they occurred and stated that he would have to talk to his colleagues before performing surgery.

On April 10, Plaintiff was transferred to TCI.  There, he was treated by Defendant Dr. Kline.  He had additional CT scans and plastic surgery consultations.  He did not have surgery. The last plastic surgeon he saw told him that, because he was not seen immediately after the assault, surgery would be more extensive (8 hours long instead of 1), he would require more recovery time (8 months) and he might suffer permanent nerve damage and excessive scarring. Plaintiff alleges that he still has pain, dysfunction in his jaw, and an obvious deformity in his facial bones.  He claims that Drs. Cullen and Kline were deliberately indifferent to his serious medical needs because they did not send him to the hospital for timely treatment, delayed his treatment, and let his broken facial bones heal improperly.  He alleges that Drs. Saul and Eddy, medical directors for the Ohio Department of Rehabilitation and Correction ("ODRC"), were deliberately indifferent to his serious medical needs because they refused to authorize the surgeries and treatment the doctors and specialists recommended.

Plaintiff also alleges that he suffered an eye injury when he was assaulted and that this injury was not properly treated.  He claims that he has been told that he will lose the vision in his

3

left eye completely.  He filed this lawsuit alleging that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.  He asks for surgery and other intervention so that his facial injuries can be corrected to the extent possible and for compensation for his pain, suffering and ongoing dysfunction.[4]  He requests one million dollars in compensatory damages, five million dollars in punitive damages, and one million dollars in "nominal damages for psychological distress and emotional pain and suffering."

In their Motion, Defendants argue that Plaintiff cannot show that they acted with deliberate indifference, which is necessary to prove a violation of his Eighth Amendment rights. Doc. 82, pp. 5-9.  They also assert that they are entitled to qualified immunity.  Doc. 82, p. 15. Plaintiff filed a responsive brief (Doc. 94) and Defendants replied (Doc. 96).

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(a).  The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). Once the moving party has met its burden, the non-moving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 257 (1986).  "[A] party opposing a properly supported motion

---

[4]  The undersigned previously ordered the parties to explore whether the non-monetary portion of this case could be resolved by agreement. The result was that Plaintiff had a 3D CT scan, he was given three options for treatment by a plastic surgeon, he selected a surgical option, and that surgery was approved by ODRC.  See Doc. 77, pp. 5-6, Doc. 97, Doc. 98.  Plaintiff recently indicated that he had his surgery on November 2, 2017.  Doc. 99, p. 1.  However, the parties advised the Court on December 8, 2017, that the case has not been resolved.  Doc. 101.

for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 256; *Matsushita Elec. Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. at 248.

### III. Standard of Review in Eighth Amendment cases

In *Estelle v. Gamble*, 429 U.S. 97 (1976 ), the United States Supreme Court held that prison personnel's deliberate indifference to an inmate's serious medical needs violates the inmate's Eighth Amendment right to be free from cruel and unusual punishment.  Courts evaluating deliberate indifference claims distinguish between claims alleging a complete denial of medical care and claims alleging inadequate medical care.  *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011).  When an inmate alleges inadequate medical care, "federal courts are generally reluctant to second guess medical judgments".... "However, it is possible for medical treatment to be 'so woefully inadequate as to amount to no treatment at all.'"  *Id*., quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976)).  In the Sixth Circuit, a two-prong objective and subjective test is used to assess deliberate indifference claims.  *Darrah v. Krisher*, 865 F.3d 361, 367 (6th Cir. 2017) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013).

First, under the objective test, the plaintiff must show that he had a "sufficiently serious medical need." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008).  A medical need is "sufficiently serious" if it "has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (emphasis in original) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990).  An inmate can also meet the objective standard for a serious medical need when the seriousness of his medical needs "may *also* be decided by the *effect* of delay in treatment.'" *Blackmore*, 390 F.3d at 897 (emphasis in original) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)).  A plaintiff who brings a claim based on the effect of the delay in treatment for a non-obvious serious need "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Id*. at 898 (quoting *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2004).

Second, under the subjective test, the plaintiff must show that the defendant had a "sufficiently culpable state of mind" in denying medical care.  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (quoting *Farmer*, 511 U.S. at 834).  A plaintiff must show more than mere negligence, but may prevail on proof of something less than specific intent to harm or knowledge that harm will result.  *See Farmer*, 511 U.S. at 835.  The defendant must have "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs." *Blackmore*, 390 F.3d at 896 (internal quotation marks omitted).

## IV. Analysis

### A. The evidence presented to the Court

In support of their Motion, Defendants submit declarations of Defendants Drs. Saul (Doc. 82-3), Cullen (Doc. 82-4), Kline (Doc. 82-5), and Eddy (Doc. 82-7), and a Declaration of Nurse

Metzler (Doc. 82-6).  Dr. Kline's Declaration is unsigned and undated (see Doc. 82-5, p. 8).  The purported signature line and signature of Dr. Eddy is unreadable (Doc. 82-7, p. 7).  The signatures of Dr. Cullen and Nurse Metzler (and the signature lines for Dr. Kline and Dr. Eddy) appear on separate pages from the text of their declarations, despite adequate blank space on the last page of the declarations (see Doc. 82-4, pp. 4-5, Doc. 82-6, pp. 9-10).

A signed declaration made under penalty of perjury has acceptable evidentiary value under Fed. R. Civ. P. 56.  28 U.S.C. § 1746[5]; *Peters v. Lincoln Elec. Co*., 285 F.3d 456, 475 (6th Cir. 2002).  An opposing party has a duty to object to the form of evidence presented to the Court.  *See Zbuka v. Marathon Ashland Petroleum LLC*, 2007 WL 2460275 (N.D.Ohio May 2, 2007); *Thomas and King, Inc., v. Jaramillo*, 2009 WL 649073, at *3 (E.D.Ky. March 10, 2009) (citing *Gault v. Zellerbach*, 981 F.Supp. 533, 536 (N.D.Ohio 1997).  In the absence of an objection, a court, in its discretion, may consider the evidence.  *Id*.; *see also Counts v. Kraton Polymers, U.S. LLC*, 260 Fed. App'x 825, 829 (6th Cir. 2008) (district courts may, in their discretion, strike non-conforming declarations).

Here, Dr. Kline's Declaration does not comport with § 1746 because it is unsigned and undated.  Dr. Eddy's signature line, signature and date are all illegible.  It is not clear that it is, in fact, Dr. Eddy's signature.  Thus, it is questionable whether Dr. Eddy's Declaration comports with § 1746.  Moreover, the signature lines for the declarations of Dr. Kline, Dr. Eddy, Dr.

---

[5] 28 U.S.C. § 1746, Unsworn declarations under penalty of perjury, provides,

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

> (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

Cullen and Nurse Metzler are all on separate pages from the text of their declarations, despite obvious room on the last page of all the declarations for the signature lines, calling into question the evidentiary value of these declarations for this reason as well. *See Rivera v. Allstate Ins. Co.*, 140 F. Supp.3d 722, 729-730 (N.D.Ill. 2015) (disregarding declarations presented under § 1746 because, in part, the signature lines appeared on the page following each declaration); *Goldmanis v. Insinger*, 2014 WL 3739430, at *7, n. 7 (W.D. Wash. July 29, 2014) (district court explaining that it had stricken declarations because some were unsigned and another contained a signature that did not match the declaration).

Although Plaintiff did not object to this evidence, the undersigned recommends that the Declarations of Drs. Cullen (Doc. 82-4), Kline (Doc. 82-5), and Eddy (Doc. 82-7), and Nurse Metzler (Doc. 82-6), be found to lack evidentiary value for the reasons explained above. Nevertheless, because this is a Report and Recommendation, the undersigned has considered all the declarations and they are discussed below.[6]

### B. Plaintiff's purported failure to protect claim

In his brief in opposition to Defendants' motion, Plaintiff includes a section called "Motion to conform to the evidence and include a 'failure to protect' claim in this action." Doc. 94, p. 15. He indicates that Defendants referred to a "failure to protect" claim in their brief and he contends that there are facts in dispute as to whether he proved his failure to protect claim. Doc. 94, p. 16. He argues that "Defendants" had a duty to keep him safe, which they breached when he was assaulted on February 3, 2014. Doc. 94, p. 16. However, Plaintiff did not allege a failure to protect claim in his Amended Complaint. Moreover, the evidence does not show that the Defendant doctors and nurse had anything to do with his cell assignment at the time he was

---

[6] As explained more fully below, the Declarations, even given evidentiary credit, are vague and contain generic statements with few relevant citations to the medical records. The undersigned has relied primarily on the medical records themselves when analyzing Plaintiff's claims.

attacked by his cellmate in February 2014.  To the extent that Plaintiff seeks leave to add a

failure to protect claim, that request is denied.

### C. Plaintiff's Deliberate Indifference claims[7]

In his Verified Amended Complaint, Plaintiff sets forth facts relevant to his deliberate

indifference claims.  He also filed a properly sworn Affidavit with his opposition brief.  Doc. 94-

1.  In their reply brief, Defendants complain that Plaintiff adds "new facts not initially raised in

his previous pleadings."  Doc. 96, p. 3.  Defendants do not describe what "previous pleadings"

they are referring to.  To the extent Defendants allege that Plaintiff added new facts for the first

time in his Affidavit and opposition brief, the undersigned disagrees.  Plaintiff presented facts in

his opposition brief and Affidavit which are consistent with the facts he alleged in his Amended

Complaint.  *Compare*, Doc. 96, pp. 3-4 (Defendants complain that Plaintiff newly alleged that he

exhibited signs of concussion and that a doctor felt his face and asked a nurse if she wanted to

feel what broken bones felt like) with Doc. 55, pp. 5-6 (Plaintiff's Amended Complaint alleges

that he exhibited signs of concussion and that a doctor felt his face and asked a nurse if she

wanted to feel what broken bones felt like).

To the extent that Defendants complain that Plaintiff's Amended Complaint includes

additional facts that were not in his original Complaint, filed almost two years prior, the

undersigned observes that an amended complaint supersedes an original complaint.  *See Parry v.*

*Mohawk Motors of Michigan, Inc*., 236 F.3d 299, 306 (6th Cir. 2000) (amended complaint

supersedes all previous complaints and becomes the legally operative complaint).  Moreover,

Defendants did not object to Plaintiff's Amended Compliant when he filed it on March 8, 2017.

If Defendants believed that Plaintiff improperly added new facts in his Amended Complaint the

---

[7]  Defendants remark that Plaintiff has not stated whether his claims are against Defendants in their individual or
official capacities and argue that, to the extent Plaintiff's claims seek damages against Defendants in their official
capacity, such claims are barred by Eleventh Amendment immunity.  Doc. 82, p. 17.  The undersigned agrees.  *See*
*Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010).

time and place to bring that issue to the Court's attention was at the time Plaintiff filed his

Amended Complaint, not more than six months later as an aside in their reply brief.[8]

In his Amended Complaint, Plaintiff describes being attacked on February 3, 2014, and

his treatment that followed.  His claims can be broken down into the following discrete parts: (1)

he had a concussion that Defendants did not diagnose/treat; (2) he suffered an eye injury that

Defendants did not properly diagnose/treat; and (3) he had a facial fracture that Defendants

delayed in treating to Plaintiff's detriment.

### 1. Plaintiff's alleged concussion

Plaintiff alleges that, as a result of the assault on February 3, 2014, he suffered a

concussion and experienced head pain and that he vomited on his way back to his cell after

initially seeing the nurse.  Doc. 55, p. 5.  This claim fails for two reasons.  First, all of Plaintiff's

allegations regarding his concussion are against the members of nursing staff who have not been

served.  Second, Plaintiff's claim fails because he does not show that medical staff was

deliberately indifferent to his alleged concussion.  He does not show that he had a concussion.

Even if he had a concussion, he does not show how he was harmed by the treatment he received.

The nurse ordered Plaintiff sent to segregation and he was told to sleep.  Although Plaintiff

argues that he should have been taken to the hospital, he does not state what the hospital would

have done for his alleged concussion.  Even if his vomiting on the way to his cell was a result of

a concussion, Plaintiff does not assert that the nurse was aware that he had vomited.  He does not

allege ongoing, post-concussion problems.  Instead, Plaintiff asserts that he suffered two

concussion-like symptoms immediately following the attack on February 3, 2014, and disagrees

with his treatment.  This is not grounds for § 1983 liability.  *See Chasteen v. Jackson*, 2011 WL

797404, at * 5 (S.D.Ohio Feb. 28, 2011) (failure to diagnose concussion may be negligent but

---

[8]  Plaintiff sought leave of Court to amend his complaint (Doc. 54), which Defendants did not oppose.

does not rise to the level of medical mistreatment under the Eighth Amendment, quoting
*Terrance v. Northville Reg. Pysch. Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)).

### 2. Plaintiff's alleged eye injury

Plaintiff alleges that he suffered an injury to his left eye from the assault.  Doc. 55, p. 7;
see also Doc. 94-1, p. 7, ¶22.  He states that he has seen "several eye doctors" due to his
"progressive vision loss and increased pressure in my left eye from my traumatic injuries."  Doc.
55, pp. 7-8.  He claims that he was told by a specialist at Ohio State University that he will lose
the vision in his left eye completely.  Doc. 55, p. 8.  He complains that he has not seen the
specialist for follow-up treatment, that his eye pressure continues to stay above normal, and that
his vision continues to worsen.  Doc. 55, p. 8.

The evidence shows the following: Plaintiff has eyeglasses that were prescribed at TCI.
See, e.g., Doc. 82-12, p. 10.  Plaintiff complained that he woke up on October 6, 2014, with
sudden loss of vision in his <u>right</u> eye.  Doc. 82-14, p. 3.  A TCI treatment note states that an eye
exam showed that he had increased pressure in his left eye, he had 20/30 vision in his left eye
and visual acuity in his right eye was unable to be determined due to excessive blurriness, and he
was sent for a referral.  Doc. 82-12, p. 15; Doc. 94-31.  He was seen at the Ohio State University
("OSU") Wexner Medical Center on December 16, 2014.  Doc. 82-14, p. 5.  He reiterated
experiencing a sudden loss of vision in his <u>right</u> eye and also growths in the corners of his right
eye that were "irritating."  Doc. 82-14, p. 5.  He reported a history of trauma consisting of being
hit with a bungee cord on or in his left eye some ten years prior.  Doc. 82-14, p. 6.  He needed a
stitch on his left eyelid at the time.  Doc. 82-12, p. 6.  He did not report trauma stemming from
the assault by his cellmate in February 2014.  He stated that he had seen "floaters" and "flashes
of light" in both eyes "for years."  Doc. 82-14, p. 6.  Upon exam, he had increased pressure in his
left eye, 20/20 vision in his left eye, and 20/40 vision in his right eye.  Doc. 94-35.  He was

diagnosed as "glaucoma suspect" in his left eye and with decreased vision and conjunctival pigmentation lesion in his right eye.  Doc. 82-14, p. 7.  He was started on Latanoprost to treat ocular hypertension (increased pressure) in his left eye.  Doc. 82-14, p. 4.  He returned to OSU in February 2015, had perfect vision in both eyes, and increased pressure in his left eye.  Doc. 96-1, pp. 2-3.  He was again prescribed Latanoprost drops.  Doc. 96-1, p. 3.  In April 2015 he was seen at TCI and his left eye pressure had decreased.  Doc. 96-1, p. 1.  He reported that his vision improved and he was using his eye drops.  Doc. 96-1, p. 1.  He continues to receive Latanoprost eye drops.  See, e.g., Doc. 94-41.

This evidence does not show that Plaintiff: (1) has a loss of vision in his left eye, (2) that the increased pressure in his left eye was caused by the trauma inflicted by his cellmate in February 2014, or (3) that the pressure in his left eye has not been addressed with the Latanoprost eye drops he has been prescribed.  Instead, the record shows that Plaintiff complained to TCI that he woke up on October 6, 2014, and suddenly experienced vision problems in his right eye; he was seen at TCI whereupon it was observed that he had increased pressure in his left eye; he was sent out for a referral to the OSU Medical Center within a month; at OSU he reported experiencing trauma ten years prior when he was hit on or in his left eye by a bungee cord; he was diagnosed with suspect glaucoma in his left eye; and he was therefore prescribed and treated with Latanoprost eye drops, which reduced his eye pressure and which he regularly received.  In his Affidavit, Plaintiff admits to using Latanoprost per the doctor's orders to treat pressure in his left eye.  Doc. 94-1, p. 8, ¶22.  Plaintiff's vaguely expressed fear of going blind one day in his left eye does not show that Defendants have been deliberately indifferent to his serious medical needs.

### 3. The alleged delay in treatment of Plaintiff's facial fracture

Plaintiff alleges that he did not initially receive treatment for the broken bones in his face and that, after it was established that he had broken bones, Defendants delayed treating his broken bones.  The undersigned considers each of these separate claims in turn.

### a. Delayed treatment and/or misdiagnosis of injuries by nursing staff prior to Plaintiff being seen by Dr. Cullen

Plaintiff alleges that, after he was attacked by his cellmate early in the morning on February 3, 2014, he was seen by Nurse Phillian.  Doc. 55, p. 5.  He states that Phillian examined him but ignored his complaints of severe pain and "did not address my facial and skull fractures, despite my telling her that my bones were broken."  Doc. 55, p. 5.  Phillian assessed him with multiple scratches, cuts and bite marks on his face, neck and hands, which she cleaned, treated and dressed.  Doc. 94-2.  She sent him to segregation after examining him.  Doc. 55, p. 5.  Once there, and still experiencing "facial and head pain [that] was excruciating," Plaintiff alleges that he pushed his emergency alarm button and a second nurse who was present during his examination with Nurse Phillian came and spoke to him and told him to go to sleep.  Doc. 55, p. 5.

Later that morning, Plaintiff told the pit call nurse that he needed to see a doctor.  Doc. 55, p. 5.  Because it was not an emergency, the nurse put him on the regular list to see the doctor.  Doc. 55, p. 5.  She did not listen when Plaintiff told her it was an emergency.  Doc. 55, p. 5.  When staff brought his breakfast, he could not eat it due to face, jaw and skull pain.  Doc. 55, p. 6.  When the second shift pit call nurse did his rounds, Plaintiff "pleaded to see the doctor."  Doc. 55, p. 6.  Upon learning that Plaintiff could not eat, the second shift nurse gave him Ensure to drink and told him that he would be placed on the list to see the doctor the next day, February 4.  Doc. 55, p. 6.

Plaintiff did not see the doctor on February 4.  Doc. 55, p. 6.  The second shift nurse gave him more Ensure and again put him on the doctor's list for the next day, February 5.  Doc. 55, p. 6.  In his Amended Complaint, Plaintiff states that he saw Dr. Cullen on February 5 (Doc. 55, p. 6) but, in his Affidavit, he states that he saw Dr. Cullen on February 6.  Doc. 94-1, p. 3, ¶¶8-9.

Neither party identifies medical records regarding Plaintiff's visit with Dr. Cullen on February 5 or 6.  Dr. Cullen's Declaration is confusing as to when he saw Plaintiff.  Dr. Cullen refers to an "initial visit" with Plaintiff during his required rotation in the mental health clinic after the assault but does not provide a date or citation to a medical record.  Doc. 82-4, p. 2, ¶¶7-8.  Dr. Cullen also states that he saw Plaintiff on February 6 when he was in "Doctor Sick CALL."  Doc. 82-4, p. 2, ¶9.  Despite this lack of record evidence, Plaintiff and Defendants are in agreement that Dr. Cullen saw Plaintiff on February 5 or 6.

As an initial matter, all Plaintiff's allegations up to the time of Dr. Cullen's exam complain of treatment by the nurses, none of whom was served as a defendant in this case.  Plaintiff's claims against unserved nurses fail.

Moreover, Plaintiff admits that he was given Ensure to drink when he complained that he could not eat.  He saw the doctor a few days after the assault, at which time he alleges the doctor diagnosed him with broken bones in his face.  Doc. 55, p. 6.  To the extent that he claims he was misdiagnosed by nursing staff as having superficial cuts rather than broken bones, this claim fails because it describes negligence, not deliberate indifference.  Finally, although Plaintiff complains that he was experiencing pain and complains that he was not given "proper medication" (Doc. 55, p. 8), he does not allege that he was not given any medication to address his pain.  For all these reasons, Plaintiff's claims regarding treatment he received by nursing staff prior to Dr. Cullen's exam on February 5 or 6 fails.

14

### b. Delayed or non-treatment at CRC of broken facial bones from February 5 or 6 until March 25.

Plaintiff alleges that Dr. Cullen assessed him with broken bones in his face on February 5 or 6 after examining him.  Doc. 55, p. 6.  He asserts that Dr. Cullen diagnosed him by feeling the bones in his face, Doc. 55, p. 6, which, he alleges, contained "jagged edges."  Doc. 94-1, p. 3, ¶9. He states that Dr. Cullen explained to him that he needed to have an x-ray and ordered an x-ray to be taken.  Doc. 55, p. 6.  An x-ray was taken on February 10.  Doc. 55, p. 6.  The x-ray impression was "Probable zygomatic arch fracture.  Radiographs of the facial bones with an additional submental vertex view is recommended."  Doc. 82-9, p. 17.

Dr. Cullen saw Plaintiff again on February 20 and ordered second x-rays per the recommendation of the radiologist who read the first x-rays.  Doc. 82-4, p. 2, ¶11.  The second x-rays were taken on February 26.  Doc. 82-4, p. 2, ¶11; Doc. 94-8, p. 2.  The x-rays confirmed "a comminuted depressed angulated fracture involving the left zygomatic arch."  Doc. 94-8, p. 2.  A comminuted fracture is one that is broken or crushed into small pieces.[9]

Dr. Cullen states that Plaintiff was then seen the next day (February 27) "by the regular contract physician."  Doc. 82-4, p. 2, ¶12.  Dr. Cullen states that a "request for a plastic surgery consult was initiated; the then acting CMO agreed with the consult request and thereafter."  Dr. Cullen's Affidavit cuts off midsentence and, therefore, he does not explain what happened after the consult was ordered.  Doc. 82-4, p. 2, ¶12.  He also does not identify who the "regular contract physician" was.

Plaintiff identifies the contract physician as Dr. Rhigi.  Doc. 55, pp. 6-7; Doc. 94-1, p. 4, ¶12.  Plaintiff agrees that he saw Dr. Rhigi on February 27.  Doc. 94-1, p. 4, ¶12.  In Plaintiff's Amended Complaint, he alleges that he asked Dr. Rhigi why he hadn't "been sent out yet" and Dr. Rhigi stated it was because he was "doing good."  Doc. 55, p. 7.  Plaintiff questioned how

---

[9] *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 391.

15

Dr. Rhigi could think that given his complaints.  Doc. 55, p. 7.  He alleges that Dr. Rhigi called Dr. Eddy while Plaintiff was still in her office and told Dr. Eddy that Plaintiff "needed to be sent out for surgery as soon as possible."  Doc. 55, p. 7.

In his Affidavit, Plaintiff states that he "begged" Dr. Rhigi to send him to an outside hospital but that she refused "outside treatment."  Doc. 94-1, p. 4, ¶12.  He claims that Dr. Rhigi told him, "because of healing of the bones and having not been treated [Plaintiff] would now need surgery and to expect pain and numbness."  Doc. 94-1, p. 4, ¶12.  Plaintiff told Dr. Rhigi that he "wanted surgery and not pain medications."  Doc. 94-1, p. 4, ¶12.  He alleges that Dr. Rhigi called Dr. Eddy while Plaintiff was still in her office and told Dr. Eddy that "it was her medical advice to send [Plaintiff] to outside hospital, and that I should have been sent out the same day of ass[a]ult."  Doc. 94-1, p. 4, ¶12.  Plaintiff also states that Dr. Rhigi said that his pain would be managed "in-house."  Doc. 94-2, p. 4, ¶12.

The medical records show that, on March 3, 2014, a consultative request was issued for Plaintiff to see "Plastics."  Doc. 94-9, p. 1.  An appointment with "Plastics" was made for March 25.  Doc. 94-9, p. 1.  On March 18, Dr. Rhigi ordered a CT scan.  Doc. 82-9, p. 7; Doc. 55, p. 7. She advised that her order was "ASAP – needs to be done before Plastic Surgery 3/25."  Doc. 82-9, p. 7.  The CT scan was performed on March 21.  Doc. 55, p. 7; Doc. 94-7, p. 3; see also Doc. 82-8, p. 2 (list of consultations and outside orders).  The CT scan showed:

> There is a comminuted fracture moderately depressed of the left zygomatic arch at the mid portion. There are no additional fractures identified. The paranasal sinuses are free of air fluid levels. There is a mucous retention cyst or polyp in the right maxillary sinus. The mastoid air cells are free of fluid. The mandible is intact and aligned anatomically.
>
> Impression; Comminuted depressed fracture of the left zygomatic arch.

Doc. 94-7, p. 3.  Plaintiff had a Telemed appointment with the plastic surgeon on March 25.

Doc. 82-8, p. 2; Doc. 94-1, p. 5.  A Telemed appointment is one in which the inmate stays at the

prison and sees the physician via a videoconferencing system.  See, e.g, Doc. 82-16, p. 3.

In his Affidavit, Plaintiff alleges, "The plastic surgeon stated that because of healing what

would have been a[] one hour surgery would now become compl[i]cated with cutting, drilling

holes to move and re-set bones; and the pain would be greater."  Doc. 94-1, p. 5, ¶14.  Plaintiff

states that he told the surgeon "I want it done" and the "doctor said he would consult with his

colleagues."  Doc. 94-1, p. 5.  In his Amended Complaint, Plaintiff states that the plastic surgeon

asked Plaintiff why he was seeing him "over two months after the injuries."  Doc. 55, p. 7.

Plaintiff also states, "I was told that if I had been sent to the hospital immediately he could have

had greater success in addressing my injuries."  Doc. 55, p. 7.

In sum, taking Plaintiff's pertinent allegations as true, the evidence shows the following.

Dr. Cullen examined Plaintiff on February 5 or 6 and assessed him with broken facial bones by

feeling his face, i.e., Plaintiff's fractures were so obvious that they could be felt in his face.  Dr.

Cullen ordered an x-ray that was taken 4 or 5 days later, on February 10, and the result identified

probable fractured facial bones but recommended further x-rays.  Ten days later, Plaintiff saw

Dr. Cullen again and second x-rays were taken 6 days after that.  The second x-rays confirmed a

comminuted depressed fracture of Plaintiff's left zygomatic arch.  Thus, it took 20 or 21 days

after Cullen first examined Plaintiff for Cullen to confirm to his satisfaction what he diagnosed

on first seeing Plaintiff.

The day after the second x-rays, Plaintiff saw Dr. Rhigi regarding his facial injuries.  On

March 3, an appointment was made for Plaintiff to see a plastic surgeon via Telemed on March

25 (50 days after the injury occurred).  Dr. Rhigi ordered a CT scan to be done prior to Plaintiff's

appointment with the plastic surgeon (she wrote "ASAP" on the request and listed the diagnosis

date as February 10).  The CT scan was done on March 21.  According to Plaintiff, on March 25, the plastic surgeon asked why he was seeing Plaintiff so long after the injury; stated that, had he seen Plaintiff immediately after the injury occurred, he could have had greater success in addressing his injury; explained that now there would be many complications addressing the injury; and remarked that he would need to talk with his colleagues before he would perform surgery.  Doc. 55, p. 7.  Defendants agree that, prior to April 10, Plaintiff's fracture "would have been well on its way to healing."  Doc. 96, p. 18.

To succeed on a deliberate indifference claim based on the delay of treatment for a non-obvious serious medical complaint, a plaintiff must place verifying medical evidence in the record to establish that the effect of the delay in treatment was detrimental.  *Blackmore*, 390 F.3d at 898.  When a plaintiff's claim stems from an injury so obvious that even a layperson would easily recognize the need for prompt and appropriate medical care, the plaintiff need not present verifying medical evidence to show that his medical condition worsened or deteriorated due to a delay in treatment.  *Id*. at 899-900.  "Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame."  *Id*. at 900.  *See also Mattox v. Edelman*, 851 F.3d 583, 598 (6th Cir. 2017) (explaining the difference between the obvious and non-obvious legal theories).

The undersigned finds that Plaintiff's broken facial bones, which could be felt on examination, presented an obvious medical need and, therefore, verifying evidence need not be placed in the record.  Plaintiff has shown that he experienced the need for medical treatment and his need was not addressed within a reasonable time frame.  Specifically, Plaintiff alleges that Dr. Cullen assessed him with broken facial bones after feeling his face on February 5 or 6; he was not sent out for treatment; he received delayed diagnostic imaging confirming he had broken or crushed facial bones; and, when he finally saw a plastic surgeon (via videoconference) 50

days after the assault, his condition had become much more complicated because his bones had begun to heal.

Alternatively, if the seriousness of Plaintiff's facial fracture is deemed to be non-obvious, he must place verifying medical evidence in the record to show that his condition worsened or deteriorated. The key evidence would be the notes from the plastic surgeon's March 25th consultation. However, *no medical records of the March 25th consultation* (or the two subsequent plastic surgeon consultations Plaintiff had in 2014) *have been provided to Plaintiff or submitted to the Court*.[10] The records of Plaintiff's plastic surgery consultations are conspicuously absent, given what the plastic surgeon allegedly opined on March 25.

The Court ordered Defendants to provide Plaintiff with his entire medical file. *See* Doc. 51, p. 1. Defendants, in a later filing with the Court, included a recent Telemed Report from a plastic surgeon at OSUH dated June 2, 2017 (see Doc. 77, p. 4; 77-1). Thus, Defendants have access to the plastic surgeon reports. The plastic surgeon reports either became part of Plaintiff's medical file at his institution, in which case Defendants should have produced them to Plaintiff, or the reports are on file at OSUH, in which case they should have been produced to Plaintiff under the Court's order dated June 5, 2017:

> Plaintiff indicated that he had had multiple video appointments with a provider at OSUH. The Court instructed Defendants to contact a high level individual at OSUH and determine what records OSUH has regarding Plaintiff and do what is necessary to obtain such records in OSUH's possession and/or have OSUH send them to Plaintiff, including, if necessary, providing a release/waiver from Plaintiff to OSUH. The Court warned Defendants that their failure to take this case seriously and comply with Court orders may result in sanctions.

See Doc. 76, p. 2. Defendants received records from OSUH that they passed on to Plaintiff (Doc. 78, p. 2), but these records apparently did not include the plastic surgeon reports from 2014.

---

[10] Also apparently missing are Dr. Righi's notes from her visit with Plaintiff on February 27, 2014, wherein Dr. Righi allegedly told Plaintiff that it was too late for treatment because his bones had already started healing.

When a party fails to comply with a court's discovery orders, the court may impose sanctions, including that an adverse inference be drawn with respect to the missing evidence. *Flagg v. City of Detroit*, 715 F.3d 165, 177 (6th Cir. 2013). "An adverse inference is an inference that the party fears [producing the evidence]; and this fear is some evidence that the circumstance or document or witness, if brought, would have exposed facts unfavorable to the party." *Id.*, quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) (quoting 2 Wigmore on Evidence, § 285 at 192 (Chadbourn rev. 1979)) (internal quotation marks omitted). An adverse inference may be drawn when the party having control over the evidence has an obligation to preserve or produce it; they failed to do so with a culpable state of mind; and the evidence was relevant to the opposing party's claim. *Id.*; *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010). Here, Defendants had control over the plastic surgery consultation notes (either because it was part of Plaintiff's institutional file or it was a record the Court ordered Defendants to obtain from OSUH). Second, Defendants' non-production of the records appears to have been done with a culpable state of mind, Defendants having produced a large number of other records from Plaintiff's institutional file from OSUH. Third, the plastic surgeon records are relevant to Plaintiff's claim. Specifically, the March 25, 2014, plastic surgeon notes are crucial to Plaintiff's ability to produce verifying medical evidence that the delay in treatment constituted deliberate indifference to his serious medical needs. Lastly, Defendants were warned that the failure to comply with the Court's discovery orders may result in sanctions. See Doc. 76, p. 2.

Thus, in the event that the Court determines that Plaintiff's broken facial bones, which could be felt on examination, did not represent an obvious medical need, the undersigned recommends that, as a sanction for Defendants' failure to comply with the Court's orders requiring them to produce the pertinent medical records in discovery, the Court draw an adverse

inference that the plastic surgeon opined, on March 25, 2014, that Plaintiff should have been seen sooner and the delay (50 days after the assault on February 3, 2014) was detrimental to him. Under either alternative finding, Plaintiff has satisfied the objective prong of a deliberate indifference claim. *See Blackmore*, 390 F.3d at 899-900.

### 4. Inadequate medical care of Plaintiff's facial injury after March 25.

On April 10, 2014, Plaintiff was transferred to TCI. He alleges that he received inadequate medical care there for his facial injury. He complains that Dr. Kline refused to follow the recommendations and orders of the specialists and plastic surgeons and that Drs. Saul and Eddy refused to "authorize and approve the appropriate surgery and treatment for my conditions" when they were told about the doctors' and specialists' recommendations. Doc. 55, p. 8.

Plaintiff does not allege that he was denied all medical care. Instead, his claims amount to allegations of inadequate medical care because he disagrees with Defendants' decision not to provide him with surgery. Courts are generally reluctant to second guess treatment decisions unless the treatment is "so woefully inadequate as to amount to no treatment at all." *Alspaugh*, 643 F.3d at 169. It cannot be said that Plaintiff's treatment after March 25 amounted to no treatment at all. Plaintiff himself alleges that his fractures had healed enough by March 25 such that surgery would be more complicated and, as a result, was not recommended by the plastic surgeon he saw on March 25. Plaintiff regularly saw Dr. Kline and he was provided two more plastic surgery consultations in 2014 (on June 17 and November 14), Doc. 82-6, p. 3-5, ¶15, as well as another CT scan in August 2014. Doc. 82-13, p. 69. The decision by Defendants not to provide surgery for Plaintiff's facial injuries when surgery at such a late date might not be prudent because it would be complicated (8 hours instead of 1 hour) and might cause him to have permanent nerve damage and excessive scarring (Doc. 55, p. 7) does not amount to woefully inadequate treatment.

**5. The subjective prong for delay in treatment from February 5 or 6 until March 25**

Plaintiff must also meet the subjective prong of the *Farmer* test, i.e., that each defendant had a "sufficiently culpable state of mind" in delaying his medical treatment from February 5 or 6 until March 25. 511 U.S. at 834. Defendants repeatedly refer to their "collegial review process" as the procedure for determining the course of treatment an inmate receives and state, in conclusory fashion, that they adhered to this policy. See, e.g., Doc. 96, p. 15. But the policies they submitted to the Court with their brief do not support their arguments. The first of three policies does not describe the collegial review process at all, and, furthermore, was not in effect until August 19, 2014, more than six months after Plaintiff was assaulted and almost five months after Plaintiff's first plastic surgeon consultation. Doc. 82-16, pp. 2-13. The next policy does describe the collegial review process but that policy did not go in effect until April 2, 2015. Doc. 82-16, pp. 14-29. The last policy is one drafted by Dr. Eddy as a protocol for "Consultation Referrals: Initiation, Process, & Follow-up" but it was not in effect until May 2015. Doc. 82-16, pp. 30-36. In other words, none of the policies submitted by Defendants was in effect in February and March 2014, the time period during which Plaintiff alleges his treatment was delayed. Defendants have not shown what their policy was as that time, nor have they explained who had what responsibility for considering other treatment options (e.g., an immediate, off-site visit to a specialist) and why they made the decisions they made. Defendants' attempt to rely on an unsubmitted policy as proof that they acted in accordance with such a policy fails.

**a. Dr. Cullen**

Plaintiff alleges that, at CRC, Dr. Cullen assessed him on February 5 or 6, 2014, with having a facial fracture by simply feeling the bones in his face; waited 4-5 days before providing him an x-ray, and then waited another 16 days before providing him a second set of x-rays

confirming that Plaintiff did, in fact, have a facial fracture. Doc. 55, p. 6. Plaintiff has shown that Dr. Cullen had knowledge of a serious medical need or of circumstances clearly indicating the existence of a need but delayed confirming his facial fracture via x-rays, in turn delaying his further treatment. *See Blackmore*, 390 F.3d at 896. Nor did Dr. Cullen request Plaintiff be sent out for treatment upon confirming that his facial bones were broken or crushed into small pieces. According to Dr. Eddy's Declaration, an inmate's treating physician requests a referral. Doc. 82-7, p. 5, ¶19. Dr. Cullen was Plaintiff's treating physician. Accordingly, Plaintiff has shown that Dr. Cullen may have been deliberately indifferent to his serious medical needs.

### b. Dr. Saul

Plaintiff alleges that Dr. Saul, who was the Regional Medical Director at CRC, told Dr. Cullen that Plaintiff should not be sent to an outside hospital and that everything should be done "in house." Doc. 94-1, p. 4, ¶12. In his Declaration, Dr. Saul states,

> I did not refuse to authorize and approve surgery and any treatment for [Plaintiff]. My only involvement in this [] case was consulting with Dr. Eddy, the chief medical officer at ODRC. I do not make any final decisions on approval of surgery and treatment in the collegial review process.

Doc. 82-3, p. 2, ¶11.[11] Dr. Saul does not describe in what capacity he consulted with Dr. Eddy or what was discussed. Without any record evidence, the Court is unable to determine what role Dr. Saul played in the Defendants' actions prior to Plaintiff's March 25 plastic surgeon consultation. If Plaintiff's allegations are taken as true, a jury could find that Dr. Saul was deliberately indifferent to Plaintiff's serious medical needs because he participated in a decision not to authorize sending Plaintiff out for treatment despite a diagnosis of fractured bones in Plaintiff's face that were broken or crushed into small pieces.

### c. Dr. Eddy

---

[11] Dr. Saul's Declaration is the only declaration submitted by Defendants that meets the requirements of 20 U.S.C. § 1746.

Dr. Eddy is the medical director for the ODRC.  Doc. 82-7, p. 1, ¶3.  In his Declaration, Dr. Eddy states that, as the medical director, he is involved in the collegial review process.  Doc. 82-7, p. 3, ¶13.  He describes that the collegial review process is used to approve or deny consultation requests and states that Plaintiff was afforded many consultative requests.  Doc. 82-7, p. 5, ¶¶17, 19-22.  That Plaintiff had several consultative requests granted is not disputed.  What *is* at issue is that Plaintiff did not have his first consultation until 50 days after his assault, whereupon his facial fracture had begun healing and what would have been a simple procedure to correct would now be more complicated.  Dr. Eddy does not provide any insight into this disputed issue.  Plaintiff alleges that Dr. Eddy was first told about his condition while Plaintiff was at CRC and that Dr. Eddy refused to authorize and approve the treatment "when [he was] informed of the extent and nature of [Plaintiff's] injuries and the recommendations by the doctors/specialists."  Doc. 55, p. 8.  Once again, there are no medical records of the plastic surgeon consultations or of the "collegial review process" decision-making in this case.  Viewing the facts in the light most favorable to Plaintiff, one could conclude that Dr. Eddy was aware of facts indicating a serious risk of harm to Plaintiff and that he ignored that risk when he failed to authorize the treatment needed to address Plaintiff's serious medical need.  *Farmer*, 511 U.S. at 837.

### d. Dr. Kline

Dr. Kline was Plaintiff's institutional doctor at TCI.  Doc. 55, p. 8.  Plaintiff was transferred to TCI on April 10, 2014.  As discussed above, Plaintiff's only viable claim is for the delay in treatment from February 5 or 6 until March 25, 2014.  Because there are no allegations against Dr. Kline that relate to that time period, Plaintiff does not show that Dr. Kline ignored a serious risk of harm.  Accordingly, Dr. Kline is entitled to summary judgment.  Drs. Cullen, Saul and Eddy are not entitled to summary judgment.

_____

Based on the foregoing analysis, Plaintiff has satisfied the subjective prong of the deliberate indifference test with respect to Drs. Cullen, Saul and Eddy.  *See Farmer*, 511 U.S. at 837.

### E. Qualified immunity

Defendants argue that they are entitled to qualified immunity.  Doc. 82, p. 15.  "Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal quotation marks omitted).  As explained above, Plaintiff has shown that, viewing the facts in the light most favorable to him, a genuine issue of fact exists as to whether a constitutional violation occurred during the time period from February 5 or 6, 2014, to March 25, 2014, as to Defendants Drs. Cullen, Saul and Eddy.  The constitutional right was clearly established.  *See Farmer*, 511 U.S. 825.  Accordingly, Defendants Drs. Cullen, Saul and Eddy are not entitled to qualified immunity for their actions regarding Plaintiff's facial fracture during that time period.

All Defendants are entitled to qualified immunity for their actions after March 25, 2014.

## V. Conclusion & Recommendation

For the reasons stated above, the undersigned recommends the following:

- Defendants' motion for summary judgment be GRANTED as to all Defendants on Plaintiff's claims regarding his concussion and eye injury.

- Defendants' motion for summary judgment be DENIED as to Drs. Cullen, Saul and Eddy on Plaintiff's claims regarding the treatment of his facial fracture during the time period from February 5 or 6, 2014, to March 25, 2014, and the Court find that Drs. Cullen, Saul and Eddy are not entitled to qualified immunity with respect to that claim.

- Defendants' motion for summary judgment be GRANTED as to Drs. Saul, Kline and Eddy on Plaintiff's claims regarding the treatment of his facial fracture from March 25, 2014, onward.

IT IS SO ORDERED.


Dated:  December 19, 2017

_____

Kathleen B. Burke
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).